JUDGE MARRERO

**18 CV 7217**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ECF Case

------------------------------------ x

SONER ACUN

                  Plaintiff,

- against -

MERRILL LYNCH, PIERCE, FENNER AND SMITH,

                  Defendant.

------------------------------------ x

Case No.

**COMPLAINT
and JURY DEMAND**

Plaintiff, SONER ACUN, *Pro se*, as and for his Complaint against Defendant, MERRILL LYNCH, PIERCE, FENNER AND SMITH, alleges as follows:

### I. NATURE OF THE CLAIMS

1. Plaintiff, Soner Acun, brings this action asserting that Merrill Lynch, Pierce, Fenner and Smith ("Merrill Lynch") discriminated against him based upon his race, religion, and national origin, and has retaliated against him based upon his complaints of discrimination and hostile work environment harassment, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. §§ 2000e *et seq.*

2. Plaintiff seeks declaratory relief, reinstatement, back pay, front pay, compensatory damages, punitive damages, interest, attorneys' fees, and costs resulting from Defendant's unlawful and discriminatory conduct.

### II. JURISDICTION AND VENUE

3. Jurisdiction of this Court to adjudicate Plaintiff's claims against Defendant exists pursuant to 28 U.S.C. § 1331 because the claims arise under federal statutes.

4. Venue is proper with this Court pursuant to 28 U.S.C. § 1391 because the Southern District of New York is the district in which Defendant resides. Venue is further proper with this Court pursuant to 42 U.S.C. § 2000e-5(f)(3) because the Southern District of New York is the

2

district in which the discriminatory acts were committed. Specifically, that is where the Plaintiff's supervisors were employed and the decision to terminate the Plaintiff was made. Moreover, it is the district in which Defendant has its principal office.

5. Plaintiff has fully complied with the administrative prerequisites for commencement of this action. Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission against Defendant. A notice of right to sue was issued by the EEOC on May 16, 2018, and received by Plaintiff on May 21, 2018. This Complaint has been filed within 90 days of notification of the right to sue.

### III. PARTIES

6. Plaintiff commenced his employment with Defendant as an intern in Summer 2011, and was hired as an employee in July 2012. He was discharged on or about November 15, 2016.

7. Plaintiff is an employee within the meaning of Title VII. 8. Upon information and belief, Defendant Merrill Lynch, Pierce, Fenner and Smith is an employer with over 15employees.

9. Defendant is a covered "employer" under Title VII.

### IV. FACTS UNDERLYING PLAINTIFF'S CLAIMS

10. In or around the summer of 2011, Mr. Acun, a Turkish Muslim, began working for Merrill Lynch as an intern in Miami, Florida.

11. As an intern, Mr. Acun reported to Dessislava Volpicelli.

12. During his internship in or around the summer of 2011, Mr. Acun participated in a conference call during which he met a colleague based in Boston, Massachusetts, Adam Drucker, who introduced himself with a warm and welcoming tone.

3

13. After Mr. Acun stated that he was from Turkey, and Mr. Drucker heard Mr. Acun's accent, Mr. Drucker's tone became cold and dismissive.

14. Mr. Acun was one of two interns that summer. One colleague that he worked with, Teresa Baute (the secretary), would only communicate with the other, Caucasian intern when she was supposed to communicate with both interns, to pass along meeting information.

15. In or around July 2012, Mr. Acun was hired full-time as a Financial Analysis and Monitoring Specialist ("FAM Specialist"), in the International Credit and Banking department in the Miami, Florida office.

16. As an FAM Specialist, Mr. Acun continued to report to Ms. Volpicelli. (Ms. Volpicelli worked from her home in Bulgaria.)

17. On Mr. Acun's first day, in or around July 2012, Mr. Acun walked into the office lobby where he came upon Jose Munoz and Henry Coy. Mr. Coy, a Caucasian male, works in the IT department. Mr. Munoz greeted Mr. Acun, and then told Mr. Coy to "say hello to my Turkish friend." Mr. Coy did not respond, and walked away.

18. In or around June 2013, Mr. Acun was permitted to work from home full-time. Mr. Acun primarily went into the office to receive software updates on his work computer (since he had to be connected to Merrill Lynch's network to receive the updates).

19. In or around late 2013, Mr. Coy told Mr. Acun, "People say you walk around looking like Taliban."

20. In or around September 2013, Mr. Acun was requested to take over a project that Mr. Drucker started. Mr. Drucker stated to management that he would schedule a meeting with Mr. Acun to address known issues regarding the data in the project.

4

21. However, Mr. Drucker refused to help Mr. Acun with the project. Mr. Drucker met with Mr. Acun for less than five minutes regarding the project, refused to schedule more meetings regarding the project, and claimed he did not know or have the information to answer any of Mr. Acun's questions regarding the project.

22. In or around December 2013, Mr. Acun was having internet connectivity issues in his cubicle, and Mr. Coy refused to fix the problems, which was part of his responsibility.

23. In or around early 2014, Mr. Coy tried to take away Mr. Acun's cubicle, and assign it as an "unassigned" cubicle, since Mr. Acun mainly worked from home. Unassigned cubicles are known to lose network connectivity, which would prevent Mr. Acun from installing the required software and security updates when connecting to Merrill Lynch's network, and would render his computer inoperable.

24. Yira Estevez, who is not Turkish or Muslim, worked from home and Mr. Coy never tried to remove her cubicle access.

25. Mr. Coy was not successful in his attempt to remove Mr. Acun's cubicle.

26. In or around May 2014, Mr. Coy bragged to other employees that he kicked Mr. Acun out of the office.

27. Throughout this period, Mr. Acun would often return to his cubicle to find that other employees had displaced items that Mr. Acun placed there. He would also find items meant for storage, such as large shipping boxes, being stored in his cubicle. (There were numerous other empty cubicles that could have been used for storage.)

28. Under Ms. Volpicelli, Mr. Acun received all positive performance reviews.

29. In or around 2015, Mr. Acun was transferred to the newly formed Global Client Segment department ("GCS").

5

30. In or around September 2015, Mr. Drucker was also assigned to GCS, and started working at the New York, New York office. Mr. Drucker became Mr. Acun's immediate supervisor.

31. Mr. Drucker controlled almost all information that Mr. Acun received to perform his duties.

32. Mr. Drucker excluded Mr. Acun from the majority of meetings that he conducted, where Mr. Drucker would gather the information needed to perform the reporting and analytic duties required. Mr. Drucker had task ownership of the tasks that Mr. Acun performed, and would frequently change expectations, withhold critical information, and criticize his work.

33. In essence, Mr. Acun was only able to accomplish work of a lesser-skilled employee -- of a low-level technician. Mr. Drucker gave Mr. Acun basic administrative and secretarial tasks to complete that were not part of his job description, such as giving dictation over the phone for Mr. Acun to type.

34. Mr. Drucker reported to the Director, Inez Louzonis, who was also based out of the New York, New York office.

35. In or around September 2015, Mr. Acun was on a conference call with Mr. Drucker and Ms. Louzonis. During this call, Mr. Drucker mentioned how he is registered for TSA pre-check, but hoped "that [his] trip to Turkey won't get him on the FBI's hit list."

36. In or around October 2015, Ms. Louzonis created weekly staff meetings. Mr. Acun was not invited to attend these meetings until in or around January 2016.

37. In or around January 2016, Ms. Louzonis set up a meeting with Mr. Acun. During the meeting, Ms. Louzonis asked Mr. Acun why he worked from home, to which he informed her that he felt subjected to isolation and harassment in the Miami office, which made him feel sick.

6

During the same meeting, Mr. Acun asked Ms. Louzonis for task ownership concerning the tasks that he was working on, so that Mr. Drucker would not be able to withhold information from him.

38. The next day, in or around January 2016, Ms. Louzonis assigned the reporting segment of a new large project to Mr. Acun. However, she did not give him task ownership of the other tasks he was performing, and it was clear from the initial meetings that the new project would not meet its goals due to factors beyond his control.

39. In or around March 2016, Mr. Drucker conducted meetings to gather information for the project, but failed to include Mr. Acun in these meetings, even though Mr. Acun was supposed to be in control of portions of the project. Mr. Acun asked Mr. Drucker for more responsibility and control concerning the project, but Mr. Drucker refused to accommodate the request.

40. Shortly after, on or about March 16, 2016, Mr. Acun contacted Human Resources and spoke with Nicholas Hernandez to learn how to file a complaint, and informed Mr. Hernandez that he will be filing a written complaint against Mr. Drucker and Ms. Louzonis as a result of their treatment, and to request accommodations.

41. Also, in or around March (17 or 18) 2016, Mr. Acun had a meeting with Ms. Louzonis where she again inquired about why he was working from home. He informed her that he was working from home because he was feeling extremely stressed and isolated in the office because of the harassment and exclusion, which made it difficult for him to concentrate, and caused frequent anxiety, profuse sweating, headaches and nausea. Ms. Louzonis was unresponsive to his issues and ordered Mr. Acun to start working full-time from the Miami office again.

42. During this meeting, Ms. Louzonis also told Mr. Acun that he was falling behind in his performance on the current project. Mr. Acun informed her that Mr. Drucker was excluding

him from some of the meetings concerning critical information in the project, and that parts of the project were falling behind because other participants had failed to do their parts in a timely manner. Ms. Louzonis then contradicted herself by stating that she did not know what the current status of the project was since she has not been at any of the recent meetings for the project.

43. Mr. Acun also asked to be moved to a different position, in which Mr. Drucker would not be his supervisor. Ms. Louzonis stated that she could only offer a position that would effectively be a demotion, and was a one-year temporary position. Mr. Acun declined the offer.

44. On or about March 31, 2016, Mr. Acun submitted a written complaint to Human Resources, concerning his feelings that he was being discriminated against at the office because he is Turkish and Muslim, and also his feelings that Mr. Drucker and Ms. Louzonis were discriminating against him.

45. On or about April 1, 2016, Mr. Acun attended a meeting with Ms. Louzonis and Mr. Drucker. Mr. Acun began the meeting by telling Ms. Louzonis that he felt that Mr. Drucker was harassing him, and gave examples. He also mentioned how Mr. Drucker reacted when he first learned that Mr. Acun was from Turkey (during the conference call in 2011).

46. When Ms. Louzonis asked Mr. Drucker what he thinks of Mr. Acun, Mr. Drucker stated that he does not like him.

47. Ms. Louzonis then told Mr. Acun that he knows what is going on, that he was given a chance to move to another position during a previous meeting, and that he should have taken that offer. Ms. Louzonis then gave Mr. Acun vaguely-defined goals with hard, short deadlines, which were extremely difficult, if not impossible to achieve.

48. On or about Saturday, April 2, 2016, Ms. Louzonis set up another meeting with Mr. Acun and Mr. Drucker for Monday, April 4, 2016 at 8:00 a.m. It was very unusual for a meeting

to be scheduled on a Saturday for Monday morning. This unusual meeting was scheduled only a few days after Mr. Acun submitted the written complaint about discrimination and harassment to Human Resources.

49. On or about April 4, 2016, during the meeting, Ms. Louzonis and Mr. Drucker acted very aggressively, yelling at Mr. Acun and giving him more demanding tasks, most of which he was not familiar with or trained for. Ms. Louzonis threatened to give him a written warning regarding an incident that happened months earlier, on or about February 16, 2016, concerning an email exchange where Ms. Louzonis accused Mr. Acun of being insubordinate.

50. Ms. Louzonis also effectively put Mr. Acun on a performance improvement plan, and scheduled meetings with him and Mr. Drucker every other day.

51. On or about April 5, 2016, Mr. Acun took six weeks of FMLA leave due to extreme stress and anxiety caused by the harassment he was enduring at work. He extended his FMLA leave for two more weeks for a total of eight weeks.

52. In or around June 2016, Mr. Acun requested from Human Resources to be transferred to a new supervisor, but his requests were denied.

53. On the last day of his FMLA leave, in or around June 2016, HR Case Manager Melissa Crawford asked Mr. Acun not to extend his FMLA leave any further, and told him that he would be allowed to temporarily work from home once again, until a final decision was made.

54. When Mr. Acun returned to work in or around June 2016, Ms. Louzonis excluded him from the regular weekly staff meetings.

55. In or around June 2016, Mr. Acun's title was changed to Business Analyst. This was essentially a demotion, as an Analyst position is generally regarded as lower than a Specialist position.

56.     Upon return from FMLA leave, Mr. Acun was also forced to go through a background check.

57.     Mr. Drucker scheduled daily meetings with Mr. Acun. Mr. Drucker's treatment of Mr. Acun became more demeaning, Mr. Drucker kept critical information from Mr. Acun, and criticized Mr. Acun's work based on information that Mr. Acun was not given access to. Mr. Acun was then forced to re-do assignments, and complete other arbitrary assignments. Mr. Drucker also made it so that the timing of assignments given would require Mr. Acun to work extremely long hours during the week, during vacation, and on weekends.

58.     In or around July 2016, Merrill Lynch hired an intern, Jonathan Meythaler, to work for Mr. Drucker. Upon information and belief, Mr. Meythaler, a non-Muslim, committed frequent mistakes, such as submitting work past deadlines, and not completing his work. Upon information and belief, Mr. Meythaler was never reprimanded for these mistakes. These mistakes were more severe than the mistakes that Mr. Acun allegedly made, for which Mr. Acun was reprimanded. Mr. Drucker and Ms. Louzonis even recommended Mr. Meythaler be hired after his internship, and he now works full-time for Merrill Lynch.

59.     On or about July 22, 2016, Mr. Acun again requested to report to another supervisor. Joanne McGinlay, in Human Resources, declined Mr. Acun's request, claiming that no other positions were available. Ms. McGinlay offered Mr. Acun a "transition package", which included three months' pay and benefits, and a release form to sign, in order to resign.

60.     On or about August 1, 2016, when Mr. Acun declined this offer, Ms. McGinlay threatened that Ms. Louzonis and Mr. Drucker would likely provide a negative performance review, and that Mr. Acun may be fired in the near future without receiving any compensation package.

61. On or about August 3, 2016, Mr. Acun received a negative performance review from Ms. Louzonis and Mr. Drucker, which contained false information, as evidenced by contradictory statements contained in earlier emails to Mr. Acun.

62. In or around August 2016, Mr. Drucker and Bryant Siu, who is Asian, made a large mistake on a project that led to the highly inaccurate information. Neither Mr. Drucker nor Mr. Siu were reprimanded for these mistakes. (Mr. Siu was recently hired and supervised by Mr. Drucker).

63. In or around August 2016, Mr. Acun provided a medical letter requesting accommodations to work from another location. Mr. Drucker encouraged the case manager to deny Mr. Acun's request. Instead of moving Mr. Acun to another office, Mr. Acun was going to be moved to another workspace, in a noisy area by the IT Help Desk, and by Mr. Coy.

64. Other GCS employees under Ms. Louzonis' supervision are allowed to work from any office, in any city that they choose, and are also allowed to work from home. This includes Jennifer Ko, who works from home in New Jersey, and Jordan Barker and Michele Rivers, who work in Jacksonville, Florida (and usually report to offices in Houston, Texas or Miami). Ms. Ko, Mr. Barker, and Ms. Rivers are all non-Turkish and non-Muslim.

65. Ms. Ko, Mr. Barker, and Ms. Rivers did not experience any of the problems that Mr. Acun faced, in that they were not discriminated against or harassed.

66. Other GCS employees also work throughout the world, including Palm Bay, Florida (Danielle Finch), Lexington, Kentucky (Stephen Brooks), and the United Kingdom (Neville Welsh-Smyth), all based upon their personal preferences.

67. Mr. Acun's requests to move to another location within the city, to move to an office in a different city, or to work from home were all denied, despite the fact that Mr. Acun did not work with anyone directly in the Miami office.

68. When Mr. Acun learned that he was required to stay in the same office, in or around September 2016, he provided another doctor's note to the case manager. This time, the request was approved and Mr. Acun was granted permission to work from home, around mid-September 2016.

69. After Mr. Acun's request to move to another supervisor was declined, in or around October 2016, GCS hired another Business Analyst to report to Ms. Volpicelli (Mr. Acun's former supervisor until September 2015, who gave him all positive performance reviews).

70. On or about October 12, 2016, Mr. Acun received a data security notice on his computer stating that it detected non-public information (account numbers) on his work computer. Mr. Acun promptly complied with the notice and relocated the files to secure storage.

71. On or about October 25, 2016, Mr. Acun emailed Ms. Louzonis and Mr. Drucker to inform them that he is capable and ready to do more work.

72. Shortly after, Ms. Louzonis and Mr. Drucker set up a meeting with Mr. Acun. In this meeting, Ms. Louzonis and Mr. Drucker gave Mr. Acun a first and final written warning, which contained falsified information, and stated that Mr. Acun has not been performing satisfactorily.

73. The final warning also contained notice of the security violation which occurred on or about October 12, 2016.

74. Mr. Acun was unaware that storing files containing account numbers on the work computer was a security violation, and had been doing so since his internship.

75. All GCS employees have files that contain non-public information (such as account numbers) on their work computers but no one else has been reprimanded for it. None of the other employees within GCS are Turkish or Muslim.

76. Ms. Louzonis and Mr. Drucker requested Mr. Acun store the files containing account numbers on a shared drive. Storing the files on a shared drive is also a security violation. Ms. Louzonis, Mr. Drucker, and the rest of GCS frequently committed these similar security violations with no repercussions.

77. In or around October 2016, Mr. Acun requested a week off for vacation. Mr. Acun was required to give two weeks' notice, whereas no one else in GCS was required to give the same amount of notice.

78. Shortly after Mr. Acun requested this time off, a four-day meeting for GCS was scheduled when Mr. Acun would be on vacation.

79. On or about November 15, 2016, Ms. Louzonis called Mr. Acun and terminated his employment with Merrill Lynch.

## V. AS AND FOR A FIRST CLAIM
*Discrimination in Violation of Title VII*

80. Plaintiff repeats and re-alleges each allegation contained in previous paragraphs of the Complaint, as though fully set forth herein.

81. Plaintiff is a employee within the meaning of Title VII, and is a member of a protected class because he is of Turkish national origin and is Muslim.

82. Defendant unlawfully terminated Plaintiff's employment on the basis of his race, national origin, and religion, in violation of Title VII.

83. Defendant violated Title VII when it repeatedly discriminated against Mr. Acun by requiring him to complete work at a job level below his title, forcing him to fail at the majority of his assignments, and treating him unlike other similarly situated non-Turkish and non-Muslim employees within GCS and Merrill Lynch.

84. Employees of Defendant also made direct discriminatory comments in his presence and negative comments that reflect a bias against Mr. Acun based on his race, religion, and national origin, including that going to his country will put an individual on a "FBI hit-list" and that he is "looking like Taliban" because he is from Turkey and is Muslim.

85. Defendant acted intentionally, willfully, and maliciously in discriminating against Plaintiff, and its conduct supports an award of punitive damages.

86. As a result of the discriminatory conduct detailed above, Plaintiff has suffered lost wages, lost benefits, and lost employment opportunities, as well as emotional distress, mental anguish, and loss of enjoyment of life.

87. Plaintiff seeks reinstatement, back pay, front pay, lost benefits, compensatory damages, and punitive damages, and payment of his reasonable attorneys' fees and costs.

## VI. AS AND FOR A SECOND CLAIM
### *Retaliation in Violation of Title VII*

88. Plaintiff repeats and re-alleges each allegation contained in previous paragraphs of the Complaint, as though fully set forth herein.

89. Defendant unlawfully terminated Plaintiff's employment in retaliation for his complaints of discrimination, in violation of the Title VII.

90. Plaintiff was retaliated against because he had made several complaints of discrimination and harassment, to both Ms. Louzonis as well as the Human Resources department. Most directly, Mr. Acun made a formal written complaint on or around March 31, 2016, and

received direct retaliation on or about April 4, 2016. Other complaints were made, including but not limited to, on or about March 17-18, 2016 and June 5, 2016. These complaints constitute protected activity under the law.

91. There is a strong inference of retaliation based upon the close timing between some of these protected complaints and some of Mr. Acun's unwarranted negative performance reviews, increased harassment, threats of written warnings from Ms. Louzonis and Mr. Drucker, placement on a performance improvement plan, removal from important meetings, and termination.

92. These retaliatory acts occurred in or around late January 2016 or early February 2016, in or around June 2016, on or about August 3, 2016, on or about October 12, 2016, on or about October 25, 2016, and on or about November 15, 2016. These acts are clearly in retaliation for Mr. Acun's engagement in protected activity.

93. Defendant acted intentionally, willfully, and maliciously in retaliating against Plaintiff, and their conduct supports an award of punitive damages.

94. As a result of the retaliatory conduct detailed above, Plaintiff has suffered lost wages, lost benefits, and lost employment opportunities, as well as emotional distress, mental anguish, and loss of enjoyment of life.

95. Plaintiff seeks reinstatement, back pay, front pay, lost benefits, compensatory damages, and punitive damages, and payment of his reasonable attorneys' fees and costs.

## IX. RELIEF

**WHEREFORE**, Plaintiff respectfully requests that the Court:

96. Declare Defendant's conduct in terminating Plaintiff's employment to be in violation of the Plaintiff's rights as secured by Title VII.

### ON THE FIRST AND SECOND CLAIMS
*Discrimination and Retaliation in Violation of Title VII*

97. Reinstatement or front pay;

98. Back pay damages for lost wages, salary, employment benefits and other compensation denied or lost to Plaintiff by reason of the violation;

99. Compensatory damages for pain and suffering, humiliation, mental anguish, emotional distress, and loss of enjoyment of life sustained by Plaintiff, in an amount to be determined at trial;

100. Interest on the amounts described above calculated at the appropriate rate(s);

101. Punitive damages; and

102. Reasonable attorneys fees and costs incurred in prosecuting this action.

## ON ALL CLAIMS

103. That the Court grant plaintiff such other and further relief as it deems just and proper.

## X. JURY DEMAND

104. Plaintiff demands a trial by jury with respect to all issues and claims properly before a jury.

Dated: Liverpool, New York
August 10, 2018

By: _____
Soner Acun
218 Grenadier Drive Apt 218 B
Liverpool, NY, 13090
Tel: (608) 556-0647
acunsoner@hotmail.com

| EEOC Form 161 (11/16) | **U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION** | R 5-21-18 |
|---|---|---|

## DISMISSAL AND NOTICE OF RIGHTS

To: Soner Acun
401 South Salina Street
Apt #617
Syracuse, NY 13202

From: New York District Office
33 Whitehall Street
5th Floor
New York, NY 10004

☐ On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 525-2017-00535 | Carlos Jacome, Investigator | (212) 336-3756 |

**THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:**

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☒ The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☐ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐ Other (briefly state)

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

*/signature/* Kevin J. Berry   5/16/2018

Kevin J. Berry,
District Director

Enclosures(s)   (Date Mailed)

cc: **Doris Warpole
Vice President, Advice and Consel Dept.
BANK OF AMERICA CORPORATION
Advice & Counsel - Agency Charges, NC1-021-09-03
401 North Tryon Street
Charlotte, NC 28255**

# INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS** -- **Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), the Genetic Information Nondiscrimination Act (GINA), or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days** of the date you *receive* this Notice. Therefore, you should **keep a record of this date**. Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was *mailed* to you** (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Courts often require that a copy of your charge must be attached to the complaint you file in court. If so, you should remove your birth date from the charge. Some courts will not accept your complaint where the charge includes a date of birth. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

**PRIVATE SUIT RIGHTS** -- **Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than 2 years (3 years) before you file suit** may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit before 7/1/10 – not 12/1/10 -- in order to recover unpaid wages due for July 2008. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice **and** within the 2- or 3-year EPA back pay recovery period.

**ATTORNEY REPRESENTATION** -- **Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do **not** relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE** -- **All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, **please make your review request within 6 months of this Notice**. (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**New York District Office**

33 Whitehall Street, 5th Floor
New York, NY 10004-2112
(212) 336-3620
TTY (212) 336-3622

November 27, 2017

**Soner Acun**
**401 South Salina Street**
**Apt #617**
**Syracuse, NY 13202**

Re: EEOC Charge No. 525-2017-00535
Acun v. Bank of America

Dear Mr. Acun,

The Equal Employment Opportunity Commission (hereinafter referred to as the "Commission") has reviewed the above-referenced charge according to our charge prioritization procedures. These procedures, which are based on a reallocation of the Commission's staff resources, apply to all open charges in our inventory and call for us to focus our limited resources on those cases that are most likely to result in findings of violations of the laws we enforce.

In accordance with these procedures, we have examined your charge based upon the information and evidence you submitted. Based on its analysis of all the evidence submitted, the Commission is unable to conclude that the information establishes a violation of Federal law on the part of Respondent. This does not certify that Respondent is in compliance with the statutes. No finding is made as to any other issue that might be construed as having been raised by this charge.

The Commission's processing of this charge has been concluded. Included with this letter is your Notice of Dismissal and Right to Sue. Following this dismissal, you may only pursue this matter by filing suit against the Respondent named in the charge within 90 days of receipt of said notice. Otherwise, your right to sue will be lost.

Please contact Investigator Carlos Jacome at carlos.jacome@eeoc.gov if you have any questions.

Sincerely,

_____ for          5/16/2018
Kevin J. Berry                      Date
District Director

Enclosure(s):
    EEOC Form 161, "Dismissal and Notice of Rights"